**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| AMALGAMATED TRANSIT UNION LOCAL 241 and AMALGAMATED TRANSIT UNION LOCAL 308, | ) ) ) | |
| | ) | Case No. 15 cv 2775 |
| Plaintiffs, | ) | |
| | ) | Judge Robert M. Dow, Jr. |
| v. | ) | |
| | ) | |
| CHICAGO TRANSIT AUTHORITY, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiffs filed this action against the Chicago Transit Authority ("CTA") under 42 U.S.C. § 1983, alleging that the CTA has violated the First Amendment by prohibiting them and their members from campaigning for mayoral candidate Jesús "Chuy" García in CTA break rooms. Before the Court is Plaintiffs' motion for a temporary restraining order [7]. For the reasons set forth below, the Court grants Plaintiffs' motion [7], temporarily restraining the CTA from (i) prohibiting Plaintiffs or their members from distributing the flyer depicted in Exhibit A of the complaint (or similar materials) in CTA break rooms and (ii) disciplining or threatening to discipline CTA employees who distribute these materials during the period covered by this order.

**I.      Background**

Plaintiff Amalgamated Transit Union ("ATU") Local 241 is a labor organization whose membership includes bus transportation workers employed by the CTA. Plaintiff ATU Local 308 is a labor organization whose membership includes rail transportation workers employed by the CTA. Both unions bring these claims on behalf of themselves and their members.

In December 2014, Plaintiffs publicly endorsed Chicago mayoral candidate Jesus García as their preferred candidate in Chicago's 2015 mayoral election. Commissioner García and Mayor Rahm Emanuel are the remaining candidates in a run-off election that will take place on April 7, 2015. In the weeks preceding the run-off election, Plaintiffs directed their officers, employees, and agents to distribute "get out the vote" campaign materials in CTA break rooms located at bus garages and rail terminals. See [1-2], Compl. at Ex. B. These materials, which do not mention by name any particular candidate for any office, apparently were distributed without objection by the CTA.

On March 12, 2015, the CTA posted a memorandum in the CTA break rooms, stating, in part, that:

> [P]olitical activity cannot occur * * * on taxpayer-funded property, which includes CTA's property. The State Employees Ethics Act prohibits CTA employees from engaging in prohibited political activity while on CTA property or using CTA resource, which activity and use includes posting or distributing campaign signs or other campaign material on behalf of any candidate for elective office.

Pltfs. TRO motion, [8-1]. In subsequent correspondence with Plaintiffs, the CTA continued to assert that Plaintiffs' campaign activities were prohibited, adding that they violated not only the Illinois Ethics Act, 5 ULCS 430/5-15(a), but also the Local Government Employees Political Rights Act, 50 ILCS 135/10(b), and CTA Rule 21, which governs "Soliciting."

The break rooms (or "training rooms" as the CTA's witnesses called them) generally include some combination of tables, chairs, couches, televisions, bulletin boards, vending machines, and recreational items such as ping pong tables. While the parties agree that off-duty employees frequently visit the break rooms between shifts, they disagree on two issues material to the legality of the CTA's restriction: the kind of work and campaign activities that take place in the break rooms.

With respect to work activity, Plaintiffs and their witnesses contend that employees use the break rooms almost exclusively for social and recreational purposes. The CTA concedes that the break rooms do serve these purposes, but according to their witnesses,[1] various work activities also take place there. These include training; communications sessions in which the CTA informs employees about its rules, policies and procedures; and "seasonal picks," when operators choose which routes they will drive based on their seniority.

With respect to campaigning, the parties agree that the CTA has permitted and continues to permit campaign activity related to union elections; as an example, the CTA designates certain bulletin boards and/or tables for campaigns relating to union matters, including elections. The parties disagree, however, on the extent to which the CTA has permitted campaigning related to *governmental* elections as a matter of custom or practice. The CTA contends that it prohibits employees from campaigning for governmental candidates on CTA property, including break rooms. Plaintiffs argue otherwise. At the TRO hearing, Carlos Acevedo, Financial Secretary Treasurer for ATU Local 241 and a former CTA mechanic, testified that during the 2014 gubernatorial election campaign, members of the ATU Latino Caucus used CTA break rooms to offer transportation to supporters of their endorsed candidate, then-Governor Quinn, so they could get to the polls. He further testified that in 1993, a candidate for precinct captain also campaigned in a break room. Acevedo testified that on both of these occasions, the political activity took place with the knowledge of CTA managers, whose offices are located next to the break rooms. Ken Franklin, the President of ATU Local 308 since January 2015 and a rail supervisor prior to that, testified that former Governor Blagojevich "campaign[ed]" in break room sometime in 2004 or 2005, shaking hands with CTA employees and discussing the

---

[1] The CTA's witnesses were Steve Wood, the Deputy General Counsel for Compliance, Policy and Appeals and the CTA's appointed Ethics Officer, and Mike Stubbe, Director of Bus Operations.

importance of mass transit. Plaintiffs' TRO motion additionally pointed to distribution of campaign materials by former Mayor Daley in break rooms, although no testimony to that effect was elicited at the hearing. Lastly, Plaintiffs argue that the CTA has permitted political events not only in break rooms, but also on other CTA property. As an example, they point to a March 27, 2015 press conference held by Mayor Emanuel in a CTA bus garage with CTA employees present, including CTA President Forrest Claypool. Defendant vigorously contests Plaintiffs' characterization of this press conference as a political event hosted by the CTA, noting that it involved a long-standing jobs program for ex-offenders (which Plaintiffs oppose) and that President Claypool attended only as part of his official duties.

## II. Analysis

A party seeking a temporary restraining order must demonstrate as a threshold matter that (1) its case has some likelihood of succeeding on the merits; (2) no adequate remedy at law exists; and (3) it will suffer irreparable harm if preliminary relief is denied. *Abbott Labs. v. Mead Johnson & Co.*, 971 F.2d 6, 11 (7th Cir. 1992). If the moving party meets this burden, then the court must consider the harm that the nonmoving party will suffer if preliminary relief is granted, balancing such harm against the irreparable harm the moving party will suffer if relief is denied. *Storck USA, L.P. v. Farley Candy Co.*, 14 F.3d 311, 314 (7th Cir. 1994). Finally, the court considers the public interest served by granting or denying the relief, including the effects of the relief on non-parties. *Id.* The court then weighs all of these factors, "sitting as would a chancellor in equity," *Abbott*, 971 F.2d at 12, and applies a sliding scale approach in which "the more likely plaintiff will succeed on the merits, the less the balance of irreparable harms need favor plaintiff's position." *Ty, Inc. v. The Jones Group*, 237 F.3d 891, 895 (7th Cir. 2001).

### A.    TRO Analysis

#### 1.    Likelihood of Success on the Merits

Under the sliding scale approach, a party seeking a TRO or a preliminary injunction must demonstrate "that it has a 'better than negligible' chance of success on the merits of at least one of its claims." *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S.A.*, 549 F.3d 1079, 1096 (7th Cir. 2008). As the Seventh Circuit has commented, this is an "admittedly low requirement." *Id*.

Plaintiffs' argument on the merits is three-fold. First, they argue that the Local Government Employees Political Rights Act, 50 ILCS 135/10(b), the Illinois Ethics Act, 5 ULCS 430/5-15(a), and CTA Rule 21 do not apply to their agents or employees who are not CTA employees. The CTA does not contest this argument, effectively conceding it.[2] Second, Plaintiffs argue that neither statute applies to CTA employees and that, while Rule 21 does apply, it does not require CTA employees to seek permission to conduct the campaign activity in

---

[2] The CTA has suggested that Plaintiffs' argument may prove too much, and there may be merit to its response. As explained further below, to the extent that the break rooms are a designated public forum at least for some people and some purposes, it remains unclear to what extent they are a designated public forum open to both CTA employees and non-CTA-employees acting on Plaintiffs' behalf. The rights of employees and non-employees to access the break rooms may well differ based on the CTA's collective bargaining agreements with the unions, CTA custom, and relevant labor law. At this early stage, the parties have not adequately developed the factual and legal issues going to any differences in the rights of access. They provided no written policy, and they elicited only scant testimony addressing the CTA's custom or practice. More specifically, there was some testimony that the CTA has given non-employee union officials access to the break rooms for at least some purposes (including hearings and other scheduled union business), and there was other testimony that the CTA has barred (and would bar) entry by union officials campaigning on behalf of governmental candidates rather than union candidates. Given the paucity of information in the briefs and the record, the Court is in no position to address whether the CTA may prohibit entry by non-employees whom Plaintiffs may wish to enlist in their cause—"local unions, local officers, or organizers brought in from Washington, D.C.," [15] at 2. Moreover, the Court finds nothing either in the issuance of this TRO or in the upcoming run-off election that creates grounds for changing whatever policies or practices the CTA has had in place. These events neither give Plaintiffs' agents access that they previously lacked nor does it permit the CTA to bar any access previously granted by policy, custom, or practice.

question.[3]  Third, Plaintiffs argue that in the absence of any prohibitions from either statute or CTA Rule 21, all that remains is a First Amendment merits analysis.  They argue that, under the First Amendment, the break rooms are designated as a public forum, as they have been opened up for campaign use by union and CTA employees.  They reason that strict scrutiny applies to governmental restrictions on speech in a designated public forum, *Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 461 (2009), and that the current restriction does not survive strict scrutiny.  In its briefs and in Court, the CTA has almost exclusively addressed the Plaintiffs' second argument.  Accordingly, on motion for a TRO, the core of the merits analysis turns on the applicability of the two statutes and whether Rule 21 required Plaintiffs to seek permission to conduct their campaign activity in the break rooms.  The Court considers each provision in turn.

### a.  Local Government Employees Political Rights Act

Under the Local Government Employees Political Rights Act, "[n]o employee of a unit of local government * * * may * * * engage in political activities while at work or on duty."  50 ILCS 135/10(b).  Plaintiffs interpret "at work" to mean "on duty," arguing that the statute cannot apply to off-duty CTA employees as a matter of law.  Taken literally, their construction would be strange and unlikely, as courts generally interpret statutes so as not to render one part inoperative, superfluous, or meaningless.  *McClain v. Retail Food Employers Joint Pension Plan*, 413 F.3d 582, 587 (7th Cir. 2005).  However, it is also possible to construe Plaintiffs' argument as interpreting "at work" to mean "engaged in" or "doing" work.  Plaintiffs alternatively argue that even if off-duty employees can be "at work" within the meaning of the statute, they are not "at work" if they are specifically in a break room; break rooms are used for resting and socializing, not for work.

---

[3] Notably, Plaintiffs do not contest the constitutionality of either statute or Rule 21.

The CTA appears to construe "at work" to mean either "at their work site," [11] at 1, or "at the workplace" [11] at 8. This, too, is a plausible reading, though by no means an inevitable one. The CTA also appears to argue that employees are "at work" when they are in the break rooms because various work activities—including training, communications sessions, and seasonal picks—take place there. The testimony during the hearing suggested that a large percentage of the time that CTA employees spend in the break rooms is not spent on work-related activities, so the CTA seems unlikely to prevail on the statutory construction question unless one of their preferred meanings (equating "work" with work site or workplace) is accepted.

In giving meaning to statutory language that lacks complete clarity, courts sometimes turn to structure or purpose. In this regard, the CTA states that the "obvious" objective of the state law ban on political activity while at work or on duty is to ensure "that civil servants and other public employees carry out their public duties in a neutral, evenhanded manner, and not in service of their own or a party's political agenda." [11] at 1. Accepting that characterization as accurate for present purposes, it is easy to see that CTA bus drivers and train operators cannot promote their preferred candidates while transporting passengers, and Plaintiffs do not argue otherwise. But it is less clear to the Court—at least based on the current truncated record and in the short time for reflection that the TRO posture has afforded—that CTA employees are carrying out "public duties" in the break rooms between shifts or at other times when they are off the clock.

The meaning of the statute may turn on how often the break rooms are used for work versus non-work purposes—a disputed and underdeveloped issue at this stage. For present purposes, the Court finds based on the testimony of Acevedo, Franklin, Stubbe and Wood that

Plaintiffs have at least a reasonable prospect of establishing that the break rooms are used primarily for resting and socializing, not for work.[4]  Plaintiffs also have a fair chance of prevailing on their argument that the phrase "at work" should be narrowly construed to exclude most, if not all, of the activity that occurs in the break rooms.  See *Clark v. Martinez*, 543 U.S. 371, 395 (2005) ("The modern canon of avoidance is a doctrine under which courts construe ambiguous statutes to avoid constitutional doubts.").  In short, the Court finds a "better than negligible" likelihood that the Political Rights Act does not apply to CTA employees in the break room because they are not "at work."  See *Girl Scouts of Manitou Council*, 549 F.3d at 1096.

### b.    Illinois Ethics Act

The Illinois Ethics Act provides that:

> State employees shall not intentionally perform any prohibited political activity during any compensated time (other than vacation, personal, or compensatory time off). State employees shall not intentionally misappropriate any State property or resources by engaging in any prohibited political activity for the benefit of any campaign for elective office or any political organization.

5 ULCS 430/5-15(a).  Plaintiffs argue that this statute is inapplicable because they intend only to use off-duty CTA employees (or non-employees) to distribute campaign literature for Commissioner García in the break rooms.  In other words, they will not engage in political activity during "compensated time."  5 ULCS 430/5-15(a).  The CTA offers little in response, effectively conceding this point.  Plaintiffs also argue that even if the Act applies, they have not violated it because their activities would not "intentionally misappropriate any State property or resources."  5 ULCS 430/5-15(a).  More specifically, they argue that they have not used any state resources and that, in light of CTA custom, they cannot have intentionally misappropriated CTA property by using the break rooms.  According to Plaintiffs, the CTA, by custom, has permitted

---

[4] Like every other factual finding in this opinion and order, this factual finding is for the purposes of this motion only.

use of the break rooms for campaign activities. To be sure, the evidence adduced at the TRO hearing fell far short of establishing the "free license" that Plaintiffs' suggested in their briefs, and there was no testimony in regard to the assertion that campaign workers for former Mayor Daley freely distributed material in break rooms. There was testimony, however, of campaign activities undertaken by or on behalf of former Governors Quinn and Blagojevich. Recognizing that neither party was able to marshal the full panoply of witnesses or affiants in the compressed timeframe associated with a TRO motion, the Court finds based on the evidence available at this time that Plaintiffs' "intentional misappropriation" argument is plausible enough to provide Plaintiffs with a better than negligible chance of prevailing on the argument that the Illinois Ethics Act does not apply, and that even if it does, Plaintiffs did not violate it through intentional misappropriation of CTA property or resources.

### c. CTA Rule 21

CTA Rule 21 provides that:

> Canvassing, soliciting, circulating petitions, distribution of material or the collection of money by or from employees on CTA property is prohibited without written permission of the CTA. Notwithstanding the foregoing, canvassing, soliciting, circulating petitions, or distribution [of] material is not prohibited and may be conducted without permission of the CTA if such activity satisfies all of the following criteria:
>
> 1. it does not take place during working time;
>
> 2. circulation of petitions and distribution of material may only take place in non-working areas of the CTA's property; and
>
> 3. it does not interfere with normal working activities of employees or inconvenience passengers.

Pltfs. TRO motion, [8-2] at 5.

Plaintiffs argue that their campaign activities do not violate Rule 21 because all three conditions are satisfied. First, they argue that CTA workers have not distributed campaign

materials "during working time"; again, they have only distributed these flyers while off-duty. Second, they argue the break room is a "non-working area" of CTA property. Third, they argue that their conduct "does not interfere with normal working activities of employees or inconvenience passengers."

The first condition and third conditions likely apply. With respect to the first condition, Defendant does not contest that CTA employees have only distributed campaign materials while off-duty. With respect to the third condition, Plaintiffs have pledged that they will not approach on-duty workers or disrupt any work activities taking place in the break room (and distributions contrary to those representations would be impermissible). Defense counsel referenced a disruption associated with an attempt to solicit funds for litigation in a break room approximately eight to ten years ago, but they have not provided evidence of current disruptions, nor do Plaintiffs suggest any interest in that kind of activity.

At issue is the second condition. As explained above, the CTA characterizes the break room as a work area, but Plaintiffs characterize it as a rest area. Plaintiffs argue that the Court should resolve any factual ambiguities as to whether a break room is a "non-working area" in their favor, given the CTA's past practice of permitting campaign activities in the break room without requiring permission. The CTA argues that, while it has permitted campaign activity elated to union elections without requiring permission, its policy has differed with regard to governmental elections. The testimony in this regard is unsurprisingly underdeveloped, and the evidence that does exist creates a hotly disputed issue of fact; the CTA witnesses testified to their understanding (and intention) that the break room be a "working area," but Plaintiffs' witness testimony suggests a gap between how the break rooms are supposed to function in theory and how they function in reality. Plaintiffs' argument that the break rooms are a "non-working area"

10

within the meaning of Rule 21 therefore could plausibly prevail. Combining this conclusion with its foregoing analysis on the first and third conditions, the Court finds that Plaintiffs have a more than negligible chance of prevailing on their argument that their campaign activity in question does not violate Rule 21, at least as implemented by CTA management in recent years.

### d.  First Amendment

Assuming the statutes and Rule 21 are inapplicable (or, if they do apply, that Plaintiffs have not violated them), all that remains is a preliminary analysis under the First Amendment. Plaintiffs argue that the break rooms are designated public fora because the CTA has opened them up for campaign activity relating to both union and governmental elections. They reason that strict scrutiny applies to governmental restrictions on speech in a designated public forum, *Pleasant Grove City, Utah*, 555 U.S. at 461, and that the CTA's current restriction does not survive strict scrutiny. In its response motion, the CTA argues that it is irrelevant whether break rooms are public fora because the state statutes prohibit political activity there. The logic of the CTA's argument further suggests that the break rooms are non-public fora with respect to governmental as opposed to union elections, given its reading of the relevant state laws and the facts it asserts regarding CTA custom or practice.

It remains unclear whether the CTA designated the break rooms as limited public fora for campaign activity relating to both union and governmental elections or union elections only. It is undisputed that the CTA has permitted First Amendment-type activities, including canvassing, soliciting, circulating petitions, and distributing material, in relation to union elections, so it seems likely that Plaintiffs could establish that the break rooms are limited public fora at least for these purposes. Plaintiffs have presented less evidence that the CTA has permitted these same First Amendment-type activities in relation to governmental elections, and the evidence that they

have presented on this point is contested by the CTA.  But given the "admittedly low" threshold that Plaintiffs must cross to show "some likelihood of success on the merits," see *Girl Scouts of Manitou Council*, 549 F.3d at 1096, especially where the other factors weigh in their favor (see below), the Court finds that Plaintiffs have adduced enough evidence at the TRO phase to make it plausible that the CTA has designated its break rooms as limited public fora for political activity relating both to union and general elections.

Keeping in mind the forgiving applicable standard, the Court concludes for the reasons stated above that Plaintiffs have shown a sufficient likelihood of success on the merits to warrant a TRO, provided that the other factors also weigh in their favor.[5]

## 2.    Inadequate Remedy at Law / Irreparable Harm

The "'loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.'"  *Am. Civil Liberties Union of Ill. v. Alvarez*, 679 F.3d 583, 589 (7th Cir. 2012) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976).  "'[Q]uantification of injury is difficult and damages are therefore not an adequate remedy.'"  *Am. Civil Liberties Union of Ill.*, 679 F.3d at 589 (quoting *Flower Cab Co. v. Petitte*, 685 F.2d 192, 195 (7th Cir. 1982)).  Accordingly, in First Amendment cases, "'the likelihood of success on the merits will often be the determinative factor.'"  *Am. Civil Liberties Union of Ill.*, 679 F.3d at 589

---

[5] Lastly, Plaintiffs argue that the National Labor Relations Act (NLRA) and Illinois labor law also prohibit the restriction on speech at issue.  More specifically, Plaintiffs argue that the "mutual aid and protection" provision of the NLRA and equivalent provisions under Illinois law give them the right to distribute any literature related to wages, hours and working conditions of CTA members in break rooms.  They further contend that mayoral campaigning is related to "mutual aid and protection" because the mayor controls the CTA board, the CTA board controls the CTA president, and the CTA president controls CTA employment policies.  Although the parties spent considerable time arguing this issue in their motions and before the Court, the Court declines to address the issue at this time.  On motion for a TRO, the Court only considers the likelihood that Plaintiffs will prevail on the claims they have brought in their complaint.  The complaint only alleges a violation of the First Amendment and § 1983, not federal or state labor law.  The Court declines to consider the likelihood that Plaintiffs would prevail on a claim they have not brought.  C.f. *Shanahan v. City of Chicago*, 82 F.3d 776, 781 (7th Cir. 1996) ("A plaintiff may not amend his complaint through arguments in his brief in opposition to a motion for summary judgment"); *Thomason v. Nachtrieb*, 888 F.2d 1202, 1205 (7th Cir. 1989) ("It is a basic principle that the complaint may not be amended by the briefs in opposition to a motion to dismiss, nor can it be amended by the briefs on appeal.").

(quoting *Joelner v. Vill. of Washington Park, Ill.*, 378 F.3d 613, 620 (7th Cir. 2004)). Having found that the likelihood-of-success-on-the-merits prong weighs in Plaintiffs' favor, the Court concludes that this prong also weighs in favor of a temporary restraining order.

The Court is unpersuaded by the CTA's argument that Plaintiffs will not suffer an irreparable harm because they have alternative means of communicating with their members. More specifically, the CTA argues that Plaintiffs could campaign through e-mail or in CTA parking lots. To begin with, Plaintiffs' witnesses testified that they do not have the e-mail addresses of thousands of their members and that many of their older members do not use e-mail, making it a significantly less effective means of communication. Second, given the unpredictability of weather in early April in Chicago, requiring Plaintiffs to campaign in outdoor parking lots may well make their efforts less effective, particularly because similar campaign activity appears to have taken place in the break rooms in previous years. Lastly, the proximity of the run-off elections plausibly increases the harm to Plaintiffs' because their final opportunity to express their views on the two candidates is approaching. Accordingly, the Court finds that the second TRO factor weighs in Plaintiffs' favor.

### 3. Balancing of Harms and Public Interest

For similar reasons, the analysis under the final two prongs also favor Plaintiffs:

> if the moving party establishes a likelihood of success on the merits, the balance of harms normally favors granting preliminary injunctive relief because the public interest is not harmed by preliminarily enjoining the enforcement of a statute that is probably unconstitutional. *Joelner*, 378 F.3d at 620. Stated differently, "injunctions protecting First Amendment freedoms are always in the public interest." *Christian Legal Soc'y v. Walker*, 453 F.3d 853, 859 (7th Cir.2006).

*Am. Civil Liberties Union of Ill. v. Alvarez*, 679 F.3d 583, 589-90 (7th Cir. 2012) (footnote omitted). The CTA suggests that Plaintiffs' conduct has disrupted work activity in the break rooms, but they provide little supporting evidence; again the CTA's counsel only argued that,

eight to ten years ago, an attempt to solicit funds caused disruptions in the break rooms.  This evidence does not outweigh the presumed hardship to Plaintiffs alleging free speech violations.

The Court recognizes the force of the CTA's argument that it is simply trying to uphold its reading of the applicable state laws, which it is duty bound to do.  As the Court noted during yesterday's hearing, federal law (the Hatch Act) and some state laws have been held to "limit the ability of public employees to engage in politics," including by forbidding any opportunity to "distribute political literature at work."  *Bauer v. Indiana Right to Life*, 620 F.3d 704, 711 (7th Cir. 2010).  In the end, the CTA may be correct as to its reading of the applicable Illinois laws.  But there are no reported Illinois decisions construing those laws, and (as discussed above) the CTA's arguments are not so clearly correct to make the positions unassailable.  Given the abbreviated record and truncated arguments presented at the TRO stage, the Court is not in position to make a final ruling at this time.  Nor, as CTA argues and as the Court discusses below, is this Court necessarily the proper forum for a final and authoritative construction of the Illinois law issues that permeate this case. Given those uncertainties, the plausibility of Plaintiffs' arguments to the contrary, and the vital importance of First Amendment rights relating to political speech, the applicable TRO standards dictate that the TRO issue.

**B.    Abstention**

Finally, the CTA argues that the Court should abstain from ruling on the TRO to allow either the Illinois Executive Ethics Commission or the Illinois state courts to address the novel provisions of the Illinois Ethics Act and the Illinois Political Rights Act.  See *R.R. Comm'n of Texas v. Pullman Co.*, 312 U.S. 496 (1941).  The exercise of federal abstention "is the exception, not the rule."  *Haw. Hous. Auth. v. Midkiff*, 467 U.S. 229, 236 (1984).  *Pullman* abstention is warranted "only when (1) there is a substantial uncertainty as to the meaning of the state law and

(2) there exists a reasonable probability that the state court's clarification of state law might obviate the need for a federal constitutional ruling." *Int'l College of Surgeons v. City of Chicago*, 153 F.3d 356, 365 (7th Cir. 1998); see also *Moses v. Kenosha Cnty.*, 826 F.2d 708, 709 (7th Cir. 1987) (noting that abstention doctrines "are designed to afford state courts and other organs of state government a measure of respect"); *Wis. Right to Life State PAC v. Barland*, 664 F.3d 139, 150 (7th Cir. 2011) ("The [*Pullman*] doctrine is based on considerations of comity and federalism * * *."). Also, where constitutional rights are at issue, a court must consider whether the delay caused by abstention will negatively impact those rights. See *Tunick v. Safir*, 209 F.3d 67, 78 (2d Cir. 2000) ("[D]eferral to the state court is appropriate only where the claimed right can be sufficiently safeguarded during the pendency of state proceedings. It is for this reason that the *Pullman* cases look to the effect, on the constitutional right asserted, of the delay entailed by abstention.") (citing *Harman v. Forssenius*, 380 U.S. 528, 537 (1965))).

First, because the TRO does not require the Court to make a ruling on the merits of any issues in the case, granting the TRO does not prevent the state or administrative courts from definitively interpreting these statutes as a matter of first impression, nor does it disturb comity. See *Univ. of Texas v. Camenisch*, 451 U.S. 390, 394–95 (1987) (holding that a decision concerning a preliminary injunction is not tantamount to a decision on the underlying merits of the case because such preliminary proceedings are "less formal" and "less complete" than a trial on the merits, such that "the findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding at trial on the merits"); *Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 721 n.10 (2007) ("The propriety of preliminary relief and resolution of the merits are of course significantly different issues."); *Michigan v. U.S. Army Corps of Engineers*, 667 F.3d 765, 782 (7th Cir. 2011) ("In some cases, it is necessary to

15

expedite an ultimate decision, and so courts sometimes consolidate the preliminary injunction hearing with the trial on the merits.  But where such consolidation has not taken place—and it has not here—and the question is the propriety of preliminary relief, the Supreme Court has warned against 'improperly equat[ing] 'likelihood of success' with 'success''" (quoting *Camenisch*, 451 U.S. at 394)).  Second, a decision to abstain would be premature at this point because the parties have not adequately developed their abstention arguments.  See, *e.g.*, *Mich. AFSCME Council 25 v. Talbot*, 2014 WL 1653968, at *2–3 (E.D. Mich. Mar. 24, 2014) ("[c]oncluding that a decision regarding abstention would be premature" at the TRO stage because the parties' "arguments [we]re not sufficiently developed").  Third, abstaining now would have the practical effect of denying Plaintiffs' motion for a TRO, as it is unlikely that the parties would have time to present the issue to a state or administrative court before election day. *Tunick v. Safir*, 209 F.3d at 78 ("Rights delayed, after all, are often rights destroyed.").  Because the parties have not had time to adequately present the abstention issue to the Court, because the Court is able to rule on the TRO without definitively interpreting the state statutes, and because the delay entailed in abstention would effectively prohibit Plaintiffs from seeking timely relief regarding their First Amendment rights, the Court declines to abstain at this time.  However, the Court will revisit this issue at a later stage in the litigation.  At that time, the Court will permit supplemental briefing on, among other things, the hotly contested issue of whether a definitive ruling by a state court might eliminate or narrow the federal constitutional issues presented in Plaintiff's complaint.

### C.      Bond

Having concluded that a temporary restraining order is appropriate, the Court must determine the issue of bond.  According to Federal Rule of Civil Procedure 65(c), a court may

issue a temporary restraining order "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c); see also *Doctor's Assocs., Inc. v. Distajo*, 107 F.3d 126, 136 (2d Cir. 1997) (noting that a district court has "wide discretion to set the amount of a bond, or even to dispense with the bond requirement where there has been no proof of likelihood of harm"); *Johnson v. Couturier*, 572 F.3d 1067, 1086 (9th Cir. 2009) ("'[T]he district court may dispense with the filing of a bond when it concludes there is no realistic likelihood of harm to the defendant from enjoining his or her conduct.'") (citation omitted). The CTA has not requested a bond, nor has either party argued that any monetary value is at stake. Because this order will unlikely cause any monetary harm to the CTA, no bond is required at this time. See *N.Y. Civil Liberties Union v. N.Y. City Transit Auth.*, 675 F. Supp. 2d 411, 439 n.37 (S.D.N.Y. 2009) (declining to require security in a First Amendment case because there was "no evidence in the record to support a finding that Defendant will suffer any monetary damages as a result of this injunction").

## III.     Conclusion

For the reasons stated above, the Court grants Plaintiff's motion for a temporary restraining order [7] and finds and orders the following:

1.     Based upon the briefs and exhibits filed by the parties, the testimony presented at the TRO hearing, and the arguments of counsel in open court, the Court finds that Plaintiffs have sustained their burden of demonstrated some likelihood of success on the merits of their First Amendment claim. The Court also finds that Plaintiffs likely lack an adequate remedy at law and will suffer irreparable harm should a temporary restraining order not be issued. The balance of the hardships additionally weighs in their favor.

17

2.      A ruling on *Pullman* abstention would be premature at this time, as the Court has examined the likelihood of success on the merits without deciding them.

3.      A bond is unnecessary, as the CTA has not indicated that any monetary harm is at stake.

4.      Pursuant to Federal Rule of Civil Procedure 65(b), a temporary restraining order, commencing at 1:30 p.m. on Thursday, April 2, 2015, and expiring at 1:30 p.m. on Thursday, April 16, 2015, is entered.  Pursuant to this order, the CTA, its agents, servants, employees, officers, and attorneys are temporarily restrained from (i) prohibiting Plaintiffs or their members from distributing the flyer depicted in Exhibit A of the complaint (or similar materials) in CTA break rooms and (ii) disciplining or threatening to discipline CTA employees who distribute these materials during the period covered by this order.[6]

5.      This case is set for further status hearing on Monday, April 13, 2015, at 10:30 a.m. in Courtroom 1919.

Dated: April 2, 2015

Robert M. Dow, Jr.
United States District Judge

_____

[6] It does not appear that the CTA would have the authority to discipline non-employees.  Moreover, as the Court emphasized at the TRO hearing, this is not a ruling on the merits of the dispute and does not guarantee that Plaintiffs and their agents will not be subject to discipline should their actions eventually be found to have violated the law or the CTA's policies.  Nevertheless, given the importance of the First Amendment rights at stake and the possibility that Plaintiffs may prevail on the merits, the Court agrees with Plaintiffs that the potential chilling effect on the exercise of their asserted First Amendment rights justifies a bar against instituting any disciplinary proceedings at least for the fourteen days that this TRO will be in effect.